# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**LAURA MONTOYA,**

     **Plaintiff,**

**v.**                           **CASE NO. 3:16-cv-92-MCR/EMT**

**DAVID MORGAN, Individually and
in His Official Capacity as Sheriff
Escambia County, Florida; ERIC
HAINES, Individually; RICKY
SHELBY, Individually; and FRED
ALFORD, Individually,**

     **Defendants.**

_____/

## ORDER

Plaintiff Laura Montoya, a former officer with the Escambia County Sheriff's Office ("ECSO"), sues Defendants[1] in a multi-count Second Amended Complaint under various federal and state civil rights laws. More specifically, she asserts discrimination based on race and gender, in violation of the Fourteenth Amendment Equal Protection Clause (Counts III and IV) and civil rights laws (Counts V-XII), as well as retaliation based on speech, in violation of the First Amendment (Counts I

---

[1] Defendant David Morgan, Sheriff of Escambia County, is sued in his official and individual capacities, and Defendants Ricky Shelby, Eric Haines, and Fred Alford, are sued in their individual capacities.

and II) and civil rights laws (Count IX).[2] *See* 42 U.S.C. § 2000e *et seq.* ("Title VII");

42 U.S.C. §§ 1981, 1983; and the Florida Civil Rights Act ("FCRA"), Fla. Stat.

§ 760.01, *et seq*. Her claims arise out of her demotion, an alleged hostile work

environment, and her ultimate termination. Pending is Defendants' Motion for

Summary Judgment on the merits and on grounds of qualified immunity. Having

fully reviewed the matter, the Court finds that the motion is due to be granted in part

and denied in part.[3]

## I. Evidentiary Objections

Before turning to the summary judgment motion, it is necessary to resolve

Defendants' evidentiary objections. Defendants argue that the Court should

disregard Montoya's affidavit as sham. The "sham affidavit" doctrine authorizes the

court to disregard evidence that clearly contradicts prior sworn testimony, when

offered without explanation: "[W]hen a party has given clear answers to

unambiguous questions" in sworn testimony, which negates "the existence of any

genuine issue of material fact, that party cannot thereafter create such an issue with

---

[2] The Court previously dismissed Count XIII. ECF No. 50.

[3] As an aside, the Court notes that its review of the summary judgment motion has been unduly complicated by an overly voluminous record and both sides' use of broad and generalized statements in argument, untethered to specific facts. This has injected significant delay into the resolution of this motion.

an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc. v. U. S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Because there is a fine line between witness credibility, which is the sole province of the jury, and a sham affidavit, which may be disregarded as not representing a genuine issue of fact, courts are careful not to disregard as a sham for "every failure of memory or variation in a witness's testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986). Instead, courts are required "to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.* at 954. Courts also recognize that this rule can have a very "harsh effect" on a party's case, and for this reason, it is applied "sparingly." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987)).

Defendants argue that Montoya's affidavit should be disregarded as a sham on several grounds. Of particular concern is a conflict between her affidavit, which details gender-specific names she claims she was called by her supervisor, Defendant Ricky Shelby, and Montoya's prior sworn testimony, denying that Shelby called her names. More specifically, in her deposition, Montoya testified that Shelby used profanity every day, but when asked whether he had called her any names,

Montoya answered, "No."[4]  ECF No. 79-12, at 79 (Montoya depo. at 164). Relying

in part on this answer, Defendants argue for summary judgment on the hostile work

environment claim because there is no evidence of harassment based on sex.  In

response, Montoya submitted a new affidavit, saying she had complained to Sheriff

Morgan about:  "the hostile work environment Shelby had created, by his actions,

sexist comments, [and] belittling names he called me (such as 'bitch,' 'f***ing old

bag lady,' 'f***ing idiot')." ECF No. 95-1, at ¶89. This new statement plainly

contradicts her prior sworn testimony that Shelby did *not* call her names, and

Montoya offers no explanation for the omission. Nonetheless, given Montoya's

testimony regarding all of the profanity used by Shelby, this presents the type of

inconsistency that could be explained either by a lapse in memory or a complete lack

of credibility, which means it should be decided by a jury. *See Tippens*, 805 F.2d at

955 (evidence that impeaches memory is not such an "irreconcilable conflict" that it

should be disregarded as a "transparent sham").  Thus, in an abundance of caution

as well as an effort to avoid making an inappropriate credibility determination, the

Court will not consider the affidavit a sham. *See id.*, at 954 (absent an "irreconcilable

---

[4] Her full answer was:  "No.  But, you know, that's pretty demeaning when you say, 'What the f**k is wrong with you? Why can' you get this?  Get your shit together. What the hell is wrong with you?'  That's demeaning."  ECF No. 79-12, 79.  None the examples she gave in her sworn testimony included a sex-based derogatory term or name.

conflict," the jury's role of resolving questions of credibility should not be displaced by rejecting "the content of an affidavit even if it is at odds with statements made in an early deposition" (internal quotations omitted)). Defendant's remaining objections to the affidavit all address matters that likewise merely impact Montoya's credibility or add details which, although new, are consistent with her testimony, not inherently in conflict. The objection is overruled, and the affidavit will be considered and viewed in the light most favorable to Montoya.

Defendants also object to several co-worker affidavits presented by Montoya in response to summary judgment, arguing that the affidavits include statements based on speculation, rumor, inadmissible hearsay, and a lack of personal knowledge. Several of these objections are sustained, but instead of ruling on each objection separately, the Court notes that, in reaching its conclusions on summary judgment, the Court has disregarded statements based on inadmissible hearsay, speculation, or an apparent lack of personal knowledge. *See Hamilton v. Coffee Health Grp.*, 949 F. Supp. 2d 1119, 1130 (N.D. Ala. 2013) (stating, in the interest of conserving judicial resources, the court would not analyze quibbles over word choices that may be inconsistent and would base the decision only on admissible evidence).

## II.     Factual Background[5]

Montoya, a Hispanic female, began working as correctional officer in 1998 and transitioned into law enforcement at the Escambia County Sheriff's Office ("ECSO") in 2000. During her career, Montoya accumulated several commendations, including being named "Officer of the Year" for the entire agency in 2003. Sheriff Morgan promoted her to Lieutenant in 2010 and again to Captain (Colonel in charge of Criminal Investigations) in 2013. She was demoted in 2014 based on job performance deficiencies and ultimately terminated in August 2015, for insubordination and improperly disseminating Sheriff's office information during a civil deposition for a co-worker's discrimination lawsuit, *Anita Hemphill v. David Morgan, et al.,* Case No. 3:14-cv-210 RV/EMT (N.D. Fla.). There is no dispute that Sheriff Morgan was the final decisionmaker for the demotion and subsequent termination.[6] Relevant to this suit, Montoya's supervisors were Chief

---

[5] For the limited purpose of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiff. *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted). The Court is mindful that what are "considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial." *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

[6] Regarding the official capacity claims against Sheriff Morgan, "[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which [the] officer is an agent." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *see also Pompey v. Broward Cty.*, 95 F.3d 1543, 1545 n.2 (11th Cir. 1996) (resolving official capacity claims as those against a county). There are several ways to establish

Deputy Eric Haines, Senior Commander Ricky Shelby, and Captain Fred Alford, all white males.

Montoya contends that she suffered a hostile work environment at ECSO, stemming back to conduct by Haines in 2008, while she was working in the Training Unit under his direct supervision. For instance, she recalled that in October 2008, in connection with Sarah Palin's campaign event in Pensacola, Haines made several disapproving comments about women to Montoya and two other women. According to Montoya, he expressed his view that "women should not be in positions of power" and that, according to the Bible, "women were meant to be subservient to men."[7] ECF No. 95-1, ¶21; ECF No. 79-8 at 67. Shocked, Montoya asked Captain Randy Pippen, who was nearby, whether he had heard Haines's comments, and, according to Montoya, Pippen just covered both ears with his hands. According to several law

---

municipal liability under § 1983, including by (1) a formal regulation or policy, (2) an informal custom that is so widespread it amounts to a custom or usage with the force of law, (3) a decision of an employee with final policymaking authority, (4) final policymakers' ratification of their subordinates' decisions, or (5) a failure to adequately train or supervise employees. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). As the basis for municipal liability under § 1983 and § 1981 in this case, Montoya asserts that Morgan was the final decisionmaker/policymaker; that he condoned, ratified, or failed to prevent the alleged discrimination; and that there was a custom or policy of treating female employees differently than males by taking no action when a female brings a complaint.

[7] Haines denies making these statements, maintaining that, instead, he said he wished John McCain had picked Condoleezza Rice as his running mate. However, he does not deny that he quoted the Bible during this discussion and testified that he does believe that wives should submit to their husbands. ECF No. 79-10, ¶ 13; ECF No. 79-15 at 8-9.

Case No. 3:16-cv-92-MCR/EMT

enforcement officers, Haines would routinely and openly discuss his religious views with them at work and his belief that women should be subservient to men. Jerry Cox, a former Lieutenant in the Training Unit, stated in his affidavit that during one such conversation, Haines "expressed his belief that the Bible provides that women should not be in positions of leadership over men, and he confirmed that he believed that principle applied to law enforcement," and he "was not secretive about his beliefs in that regard." ECF No. 95-2, Cox Aff. ¶¶ 7, 9, 11. Philip Nix, a former Sergeant, stated in his affidavit that Haines would compare himself to Abraham from the Bible, saying it was his responsibility to rid ECSO of women and minorities. ECF No. 95-24, Nix Aff. ¶ 4. He told Nix that "men should never take direction from women in law enforcement." ECF No. 95-24 ¶6. According to Cox, Haines directed such comments at Montoya when she transferred to the Training Unit, where it was her responsibility to supervise and train male officers. Cox said, "Haines insisted that he would not work with Laura Montoya" or "support her supervision and training of male officers." ECF No. 95-2, ¶13-14.

Montoya cites at least five other instances over the years in which she felt that Haines demonstrated a bias against women and against Montoya in particular, with the latest being in April 2014. Defendants do not dispute that the following events occurred, but they provide slightly different versions of them:

• In 2008, before Sheriff Morgan became Sheriff, Montoya and Haines had a conversation about Sheriff Morgan's campaign, in which Haines told her about a pornographic video purportedly of a relative of the Sheriff. According to Montoya, while she was working late one night, Haines called her into his office and as she approached, she heard pornographic sounds coming from his office; he then told her of a pornographic website to view and commented that it made him excited to know he was viewing the Sheriff's relative. (Montoya Aff. ¶¶ 26-27). Montoya declined to view it and told him his comments were offensive.

• In January 2009, after Haines became the Officer-in-Command of Patrol, he transferred Montoya from Patrol to Court Security, which she viewed as an unwanted assignment, and Haines explained his decision stating, "they leave it up to me because it is my decision and it is for the good of the agency." (Montoya Aff. ¶ 40).

• Also in 2009, Haines denied Montoya an opportunity for FBI training on the purportedly false basis that she did not satisfy the weight requirement.

• In 2011, Haines told Montoya, in sexually explicit terms, how he disapproved of sex acts between Montoya's niece, who was a former correctional officer, and her boyfriend who was black.

• In April 2014, before a Command Staff Meeting, Haines and Montoya had a conversation about Sheriff Morgan's upcoming third-term election, and Haines commented that he hoped Sheriff Morgan would win again because he needed to keep his job, and added: "You don't have to worry about losing your job or income— your husband makes plenty of money and you should just stay at home where you belong." ECF No. 79-22 (Montoya Aff. ¶ 81).

It is undisputed that Montoya did not report any of these incidents to Human

Resources, Internal Affairs, or any commanding officers at the time, as ECSO's

policies required. Montoya felt that reporting the incidents would cause her career to suffer.[8]

Montoya states that the discriminatory conduct worsened considerably in May 2013, after Sheriff Morgan promoted her to Captain, designated her Colonel in charge of the Criminal Investigations Division, and appointed her to his Executive Command Staff ("Command Staff"), a position that is wholly discretionary with the Sheriff, according to the governing Executive Staff Agreement.[9] Shelby was Montoya's direct supervisor at this time. Shelby and Haines were both on the Command Staff with Montoya, and when she was promoted to this position, each told Montoya they were disappointed she had been promoted. Haines had offered Montoya a First Lieutenant position before she accepted the promotion, and he told

---

[8] Montoya testified, "[p]eople would -- if you complain as a female, you know that that's your sentence to death in your career, period." ECF No. 79-12 at 46 (Montoya Tr. at 114). In support of her claims, Montoya presented affidavits from other female deputies (Sandy Webber, Sherry Nix and Jacqueline Gulley) who said they had been treated poorly by Haines, Shelby, and Alford in certain situations (i.e., being yelled at by Shelby, denied accommodations for an illness by Alford and being told to "suck it up" by Haines, not given an interview for a higher position by Alford, or generally feeling that females were "scrutinized" more closely and not valued as employees). The women said they did not complain because past complaints of poor treatment had been ignored.

[9] The Agreement states also that if the Executive Staff member "should willingly relinquish rank" if he or she does "not fulfill the requirements of the position to the satisfaction of the Sheriff." ECF No. 79-8, at 7.

her she was a "last resort" even for First Lieutenant.[10] Similarly, during their first supervisor meeting, Shelby told Montoya that he disagreed with her promotion and thought "the most [she] should be is first lieutenant." Montoya states he also mumbled something like, "I don't want a woman running investigations," ECF No. 95-1 ¶ 59. Although she admitted in her deposition that she was unsure of Shelby's exact words, she insisted this was the "gist" of it.[11]

Montoya had ongoing difficulties with Shelby. Montoya complains that Shelby gave her no training and then provided inconsistent advice, such as encouraging her to speak more often in Command Staff meetings but then chastising her for talking too much; telling her to do one thing but then getting angry at her for doing it; and requiring her to obtain his approval for everything but then criticizing her for not making her own decisions. Montoya said, "I was damned if I did, damned if I didn't." ECF No. 95-1, at ¶64. While acting as her supervisor, Shelby allowed subordinates to bypass Montoya in the chain of command, and Shelby subjected Montoya to yelling, cursing, and berating and demeaning comments on a daily basis,

---

[10] According to Montoya, Haines told her, "it's sad that I've gone over the list and you're the last resort," referencing the First Lieutenant position. ECF No. 95-1, ¶ 47.

[11] Shelby explained that he felt she should have progressed in rank to First Lieutenant before moving to Captain, but he denied saying he did not believe a woman should be in the position. ECF No. 79-14 at 10 (Shelby Tr. 20)

saying things like, "why can't you f***ing do this?" or "why can't you get your shit together." She said she once complained to Sheriff Morgan that Shelby made sexist comments, calling belittling names, such as "bitch," "f***ing old bag lady," and "f***ing idiot," ECF No. 95-1, ¶ 89, but did not say how often this occurred. She considered Shelby's words demeaning, and she occasionally felt physically threatened, saying he would get so angry, he would yell and rise up out of his chair, causing her to fear that he was "going to come around the table and come at me." (Montoya Depo. at 17). Montoya could not recall whether Shelby treated male officers the same, but Defendants cite the opinions of several males who stated Shelby was an "a**hole" who berated everyone.[12] In January 2014, Montoya complained to Commander Tracy Yuhasz, a female, who said "that's just Ricky being Ricky." There is no dispute that Shelby had a reputation for being a "difficult supervisor" with a "demanding" management style.

On April 9, 2014, Montoya complained to Sheriff Morgan about Shelby's continued demeaning treatment of her, saying Shelby had created a "hostile work

---

[12] As further evidence of the work atmosphere, Montoya states that she was present during a Command Staff Meeting in December 2013, when Sheriff Morgan, Haines, and Shelby made remarks in her presence about how attractive prostitutes are in Hawaii, saying they looked like co-eds. According to Montoya, Shelby stated, "I've never wanted to go to Hawaii before but now I am going to look and see if there's a conference I can go to or book me a cruise over there so I can check it out for myself." ECF No. 95-1, ¶ 49. According to Montoya, Haines stated he was going to Hawaii in a couple of months, but "it was too bad he had to take his wife."

environment" and she felt like a "battered spouse."[13] ECF No. 95-1, ¶¶ 66-67.

Montoya said Morgan told her that a male colleague, Steve Hardy, had also

complained about Shelby, and he offered to transfer Montoya as he had done for

Hardy.[14] Montoya says she did want to be transferred and could not work for Shelby.

Morgan responded, "you're doing a great job," and he encouraged her to "stay the

course," saying "he would take care of the situation." ECF No. 95-1, ¶ 72. But,

according to Montoya, no action was taken. Instead, on the same day, Shelby

subjected Montoya to a random drug test and issued her a "Notice of Performance

Deficiencies." The Notice stated that Montoya's job performance was deficient in

the following areas: "attention to details, lack of understanding of your role and

responsibilities, leadership, organization, and decision making" and cited specific

instances from September 2013 through April 2014.[15] The Notice stated that its

---

[13] Sheriff Morgan disputes the nature of Montoya's complaint, saying she did not complain about differential treatment based on gender or race and did not say that working under Shelby was a "hostile work environment." Instead, he said Montoya advised him that she and Shelby were "not getting on the same page" and Morgan understood that even white male employees did not like Shelby's "demanding management style." ECF No. 79-8, ¶ 9.

[14] Defendants dispute this. Morgan testified that the unit reorganization was already underway and that Hardy was moved because he was the problem; he said in fact Hardy was eventually demoted for his own anger problems. According to Montoya, however, this is evidence that her complaints to Morgan were ignored whereas the unit was reorganized when a male complained.

[15] Specifically, the April 9, 2014 Notice of Deficiencies from Shelby listed the following incidents:

purpose was to provide Montoya an opportunity to improve before any corrective action would be taken. This was the first Deficiency Notice Montoya had ever received in her career,[16] and she stresses that none of the deficiencies violated any Sheriff's Office policy.

---

- In September 2013, Montoya submitted an unsigned counseling form for one of her subordinates to Shelby, after she was instructed three times that signing counseling forms was one of her responsibilities as Colonel. She made the same mistake in March 2014.

- In November 2013, after numerous meetings with Shelby, Montoya "became disconnected from staff." Shelby wrote, "I explained to you [Montoya] that we at the Command Staff level cannot let our feelings affect our effectiveness and that your actions could be perceived as ineffectiveness."

- In December 2013, Montoya failed to "provide sufficient facts to be informative to [Shelby] or Command Staff" regarding a "notable arrest," and Shelby criticized her for micro managing the troops. That same month, after instructing Montoya to include pictures in a brief to shorten it, she was criticized for providing not only pictures but also too many documents, such that the report became cumbersome and of little benefit.

- In January 2014, Montoya failed to notify Shelby "of [sic] very important meeting concerning the Evidence room investigation with State Attorney's Office, FDLE."

- In March 2014, Montoya provided a memorandum concerning a division level investigation in which she failed to include her recommendation.

- On April 2, 2014, Shelby had discussed with Montoya the "extreme need for documentation" with respect to a recent incident.

ECF No. 79-9, at 4-7.

[16] According to Montoya, the letter itself was a form of discipline, and, although it stated that it would not be placed in her file unless she failed to show improvement, she knew that every official document, including this one, would be placed into her personnel file. She ultimately failed to show improvement and was demoted. Nonetheless, the Notice itself did not adversely impact Montoya's employment by imposing any additional discipline in and of itself. It informed her that Shelby would continue to monitor her performance and look for improvement in her leadership abilities, and she was directed to identify what assistance if any she would need to improve.

On August 1, 2014, while Shelby was on vacation, Montoya dealt with a suicide investigation, during which Lieutenant Mike Gilmore committed insubordination by refusing to follow an order. The incident occurred when Gilmore refused to follow Montoya's order to release to the decedent's family a suicide note they had found during the investigation. When this occurred, Montoya consulted Haines about the incident because Shelby was on vacation, and she states that Haines advised her to conduct an Administrative Investigation into Gilmore's insubordination. She followed his advice and ultimately gave Gilmore a written reprimand but was later criticized by Shelby and Sheriff Morgan for how she handled the incident, as referenced in her demotion letter.[17] By affidavit, Phillip Nix, a former ECSO law enforcement officer, said Haines had told him that the investigation of the incident had been a "test" for Montoya, "to see if she could complete a full-blown investigation," though according to Nix, Haines knew Montoya did not know the correct procedure for such an investigation. ECF No. 95-24 ¶2. Nix felt that Haines was "setting her [Montoya] up for failure" and said he

---

[17] There is some dispute as to the details of the incident, but Montoya contends that she ordered Lieutenant Gilmore to release the note to the next of kin after the investigation was complete and cited him for insubordination when he did not immediately follow the order; Gilmore apparently questioned the legality of turning over the note. Montoya was criticized for not keeping her supervisor, Shelby, updated, for expressing doubt in her decision making, and for not directly answering Gilmore when he questioned whether releasing the note complied with policy. ECF No. 79-8, at 14-16.

told Sheriff Morgan that this was unfair. Morgan was concerned that Montoya, who was Colonel in charge of Criminal Investigations, had difficulty handling an investigation.

The same month, August 2014, Montoya again complained about Shelby's conduct, reporting to both Sheriff Morgan and Haines that Shelby had created a "hostile work environment" and again that she felt like a "battered spouse;" she complained that as a result, her subordinates were bypassing her in the chain of command. ECF No. 95-1, ¶ 89-91. Morgan's only response was that "the victim's cloak is not a very attractive cloak." ECF No. 79-8 at 80 (Montoya Tr. 42). Around this time, Haines conducted an impromptu poll of Montoya's direct subordinates to rate their view of her job performance.[18] The resulting ratings ranged between 4.8 - 5.1 on a scale of 1 to 10. Haines provided the poll results to the Sheriff.

On November 21, 2014, Sheriff Morgan asked for Montoya's "voluntary demotion" in a letter detailing additional job performance deficiencies that occurred after April 2014 and referencing her Executive Staff Agreement to relinquish her rank if the Sheriff determined she was not fulfilling his expectations. The letter

---

[18] During his deposition, Haines admitted that this poll could have a negative impact on a colonel's ability to operate within the chain of command, but he justified his action on the grounds that Montoya's subordinates "already had these opinions of her." ECF No. 79-15 at 43. Haines testified by deposition that he "wanted to document what these people thought of her and give it to the sheriff." ECF No. 79-15 at 47.

outlined broad areas of deficiencies, such as judgment and leadership, but also provided specific instances of Montoya's performance in each category, including her mishandling of the Gilmore insubordination investigation.[19] The letter specifically referenced the observations of Haines and Shelby in several incidents and identified "a fundamental and over-arching deficiency" in Montoya's "failure to consult with and seek guidance from [her] immediate superior," who was Shelby. ECF No. 79-8, at 16. The letter gave Montoya the option of voluntarily relinquishing her rank (a five percent pay cut) or receiving an involuntary demotion due to unsatisfactory performance (a ten percent pay cut). It is undisputed that the letter was based on input from Haines and "primarily" from her supervisor, Shelby; however, there is no evidence that Shelby or Haines actually recommended demotion.[20] Montoya selected a "voluntary demotion" to honor her contract but noted by email to Sheriff Morgan that she actually had no choice so she considered

---

[19] Other instances cited in the letter included Montoya's decision to allow her husband, "an unauthorized guest," to accompany her into the Evidence Warehouse during the investigation of a possible theft in May 2014; permitting a deputy to continue working on an investigation of a matter that could potentially implicate that deputy's brother in November 2014; pursuing a warrant that the State Attorney's office did not support in July 2014; and failing to follow the correct procedure in reviewing a criminal investigation in September 2014; among others. ECF No. 79-8, at 9-18.

[20] Shelby stated in his affidavit, "[a]lthough I occasionally briefed Sheriff Morgan on Montoya's performance and I knew he was aware of her ongoing deficiencies, I did not make a recommendation that she be demoted." ECF No. 79-9 at 2, ¶ 11. Shelby does not dispute, however, that the November 2014 Notice of Deficiencies Letter was based primarily on his input.

it "involuntary." She also felt that the incidents recounted as deficiencies were based on "half-truths." Following her demotion, which was effective December 1, 2014, Montoya took a medical leave due to stress.

Montoya returned to work in January 2015, in the position of Lieutenant in the Court Security Unit, under the direct supervision of Captain Fred Alford. According to the affidavit of Jacquelyn Gulley, a corrections officer in Court Security, Alford told her and others that Montoya "was not to be part of the chain of command." ECF No. 95-36, at 2. Montoya complains that Alford instigated an Internal Affairs investigation into whether she was treating females more favorably with regard to overtime scheduling, but the investigation resulted in a finding that the charge was unsubstantiated. While Montoya received a verbal counseling during January 2015 for the use of profanity from Commander Tharp, Alford never disciplined her.[21] Montoya said that a male colleague, Lieutenant Joe Webber, used profanity on a daily basis and was never disciplined.[22]

---

[21] Her verbal counseling was documented and signed by Commander Dale Tharp. According to Montoya, he nodded his head when she asked him whether Haines had directed him to do this. A verbal counseling does not amount to an adverse action because according to Sheriff's Office policy, a "verbal counseling" is an instruction ordering a certain action to take place or to stop. ECF No. 95-15, at 3 (Sheriff's Office General Order No. 403). No sanction or discipline is involved.

[22] In reply, Defendants presented evidence that in fact Webber was demoted from Captain to Lieutenant for the use of profanity, among other things, in 2010, and that in 2014, he violated a policy by using harsh language, including profanity. ECF No. 99-1, at 3-4.

On February 13, 2015, Montoya was deposed pursuant to a subpoena in a Title VII gender discrimination lawsuit filed by former Jail Commander Anita Hemphill against Sheriff Morgan and the Escambia County Board of County Commissioners. This was not a subpoena duces tecum for documents, but Montoya nonetheless brought documents to the deposition, including a copy of a draft ECSO position statement responding to the EEOC about Anita Hemphill's discrimination complaint. Haines had emailed the document to Montoya in November 2013 and instructed her to delete it after reading it. Instead, Montoya printed and retained it and then disclosed it to Hemphill's counsel at the deposition over a year later. During her *Hemphill* deposition, Montoya testified about the circumstances surrounding her receipt of the position statement.[23] Her testimony also included the harassment and discrimination that she claims she experienced at ECSO, such as Haines's comments about Sarah Palin, that women should be subservient to men, Montoya's impression that she and other women had been treated poorly because

---

[23] In November 2013, in connection with Anita Hemphill's EEOC case, Haines sent Montoya an email with a position statement attached. The email text stated the attachment was "confidential" and instructed Montoya to delete it after reading it. The same day, Haines came to Montoya's office to discuss the position statement he had emailed to her, and she felt from their conversation that Haines was attempting to convince her that he had never in the past made statements indicating he had a problem with women in law enforcement. Montoya told him she knew what he had said in the past and said she would testify truthfully if ever asked (at that time, she had not been subpoenaed to give a deposition). Before deleting the email, Montoya printed and saved a paper copy of the email and the attachment.

they were women and had been afraid to complain, and her account of her difficulties

with Shelby, that she had complained to Sheriff Morgan, but nothing was done, and

the circumstances of her demotion. Montoya stated she feared retaliation based on

her answers. After the deposition, Sheriff's attorney Debra Little, who attended the

deposition for ECSO, reported to Sheriff Morgan that Montoya had brought multiple

documents with her to the deposition and that this may have violated ECSO policies.

Also, the record reflects that Montoya's deposition transcript was emailed to Haines

and Morgan on February 20, 2015.

On March 2, 2015, Sheriff Morgan ordered an Internal Affairs ("IA")

Investigation into whether Montoya had violated a direct order of a superior or

violated any policy by the disclosure. Haines served as the Complaining Officer

because he had given Montoya the order to delete the email and attachment in

November 2013. Haines told the investigating officer, Lieutenant Doyle Gresham,

that his email was a direct order for Montoya to destroy the position statement after

reading it because it was a "draft or possible legal strategy." ECF No. 95-42.

Montoya explained to Gresham that she had retained a paper copy of the position

statement because of the conversation she had with Haines the same day in which

he attempted to influence what she recalled about his prior gender-biased comments.

ECF No. 95-46, at 5. She told Gresham that she made it clear to Haines that if called

to testify in the *Hemphill* case, she would testify truthfully, and she did keep a hard copy of the email and attachment.  Gresham also interviewed the two Sheriff's attorneys who had been present at the *Hemphill* deposition, Debra Little and Wes Gay.

The IA report sustained the finding of two offenses: (1) "Insubordination Offense—Compliance with Direct Order of a Supervisor," and (2) "Improper Conduct Offense—Dissemination of Information" (which requires that official business of the Sheriff's office be kept as confidential and allows the removal of records or reports only in accordance with established procedures).  The report found that Montoya "did not follow the meaning (purpose) of the order given by Chief Haines ('It needs to be deleted once you've read it.')" when she failed to destroy it. ECF No. 95-46, at 8.  Montoya submitted a written grievance to Morgan based on the findings, contending she did not disclose "confidential material" because it was a public record, and she argued that she did not disobey an order because she deleted the email, that no one told her not to bring documents to the deposition, and that the Sheriff's attorneys present saw the documents but did not advise her not to disclose them.  ECF No. 95-51.

On August 6, 2015, an independent Disciplinary Review Board[24] met to review the IA's findings. The ECSO ordinarily followed a disciplinary matrix that was incorporated into its union collective bargaining agreement when imposing discipline. In this instance, the matrix recommended a 20-hour presumptive suspension or a 30-hour maximum suspension, ECF No. 95-48. However, the Board voted to deviate from the Sheriff's discipline matrix and recommend termination. The Board explained that in its view, the disciplinary matrix was insufficient to address Montoya's conduct, explaining that this incident was "much more than insubordination" and evidenced "a clear attempt by an employee to sabotage the operation of the Sheriff's Office." ECF No. 79-6, at 5.

On August 13, 2015, a pre-disciplinary hearing was held. Present were Montoya and her PBA (the police union) representative Roy Kinsey, as well as the Sheriff, the Sheriff's attorney Gerald Champagne, and some administrative and human relations staff. Consistent with Montoya's grievance statement, Kinsey explained why she had preserved the email and position statement and why she felt it was not confidential or privileged. Champagne stated that although the final

---

[24] The Disciplinary Review Board was comprised of seven males and one female: Commander Lee West - Chairperson (non-voting); Lieutenant Doyle Gresham - Presenter (non-voting); Lieutenant Walt Mathews; Lieutenant Richard Baily; Lieutenant Scott Allday; Lieutenant Joe Webber; Cheryl Melaven; and Master Deputy Lee Tyree. ECF No. 79-6.

version of the statement would be a public record, the document Montoya had in her possession at the deposition was a draft, not the final position statement, and was not a public record while the *Hemphill* litigation was ongoing. Following the hearing, Sheriff Morgan made the decision to terminate Montoya based on the IA report and the Disciplinary Review Board's recommendation. It is undisputed that he had no input from Haines (other than his interview during the investigation), Shelby or Alford.

## III.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of . . . identifying th[e] portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted). The burden then "shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). The self-serving statement of a litigant can defeat summary judgment if it is based on personal knowledge and is

not conclusory in nature. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (self-serving sworn statements are not to be disregarded at the summary judgment stage). In deciding a motion for summary judgment, courts view the evidence in the light most favorable to the nonmoving party, resolving all ambiguities and drawing all justifiable inferences in favor of that party, eschewing determinations of credibility, weighing of evidence, and other functions properly left to a jury. *See Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

## IV. Discussion

At the outset and after fully reviewing all of the claims, arguments, and evidence, the Court finds the record insufficient for Montoya to prevail against the summary judgment motion on any race-based claim under § 1981 or any claim against Alford.[25] Therefore, Defendants' motion on those claims will be summarily granted, and only the remaining claims will be discussed substantively.

---

[25] The only possible issue in the record regarding Montoya's race was that she discovered her race/ethnicity had been changed in her personnel file from Hispanic to white. Evidence offered by the Defendants in reply clearly shows that this occurred due to an automated computer system change, and the error was corrected after Montoya notified the personnel department of the problem. No adverse employment action occurred and no inference of discrimination arises from this incident. Montoya includes race in argument headings but makes no other arguments based on race in opposition to the summary judgment motion. As to Alford, there is no evidence that he took any adverse action against Montoya, and consequently, he is entitled to summary judgment.

## A.     Disparate Treatment

It is unlawful to discriminate on the basis of gender[26] in the terms, conditions, or privileges of employment under Title VII, 42 U.S.C. § 2000e-2(a)(1), the FCRA, Fla. Stat. § 760.01, and the Equal Protection Clause of the Fourteenth Amendment, *see Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003). Under the Title VII framework, which applies in each of these legal contexts,[27] an employee must establish discriminatory intent "through either direct evidence or circumstantial evidence."[28] *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).   When the plaintiff attempts to prove discriminatory motive by circumstantial evidence, the *McDonnell Douglas* burden-shifting framework is often appropriate to analyze whether the evidence permits a reasonable inference of

---

[26] For purposes of this order, the terms "gender" and "sex" are used interchangeably.

[27] Claims of intentional employment discrimination asserted under Title VII, FCRA, and the Equal Protection Clause are analyzed the same, and thus the Court will use the Title VII analysis without including a separate discussion for each claim.  *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009)*; see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010) ("Because the FCRA is modeled after Title VII, claims brought under it are analyzed under the same framework . . . the state-law claims do not need separate discussion and their outcome is the same as the federal ones.").

[28] "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Wilson*, 376 F.3d at 1086 (internal citation and marks omitted).  It consists of "only the most blatant remarks" that prove an intent to discriminate with no further inference. *Earley v. Champion Int'l*, 907 F.2d 1077, 1081 (11th Cir. 1990).  By contrast, circumstantial evidence only "suggests, but does not prove, a discriminatory motive" in the employment decision. *Wilson*, 376 F.3d at 1086; *Burrell v. Bd. of Trustees of Georgia Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).

discriminatory intent. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, to raise an inference of discrimination where the employee has been demoted or disciplined for violating a work rule, she must establish a *prima facie* case by showing (1) she is in a protected class, (2) she was qualified and (3) that a similarly situated employee outside the protected class was treated more favorably, or disciplined less harshly for the same misconduct. *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1276 (11th Cir. 2008) (noting also the existence of other formulations of the prima facie case, depending on context). Once this *prima facie* case is established, it "creates a rebuttable presumption" of unlawful discrimination that shifts the burden to the employer to provide a legitimate, nondiscriminatory reason for treating the employees differently. *See id.* at 1275 (quoting *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265 (11th Cir. 2002)). If the employer meets this burden of production, the presumption of discrimination is rebutted, and the plaintiff must show with greater specificity that the reason offered to justify the differential treatment was merely a pretext for unlawful discrimination. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). Pretext is shown where there is evidence that the reasons given are false *and* that discrimination was the real reason. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Case No. 3:16-cv-92-MCR/EMT

Montoya argues that the circumstantial evidence establishes a *prima facie* case of gender discrimination under the *McDonnell Douglas* framework. The undisputed evidence shows that she has met all but the final *prima facie* element— she is in a protected class as a female, she was qualified for the job of Colonel of Criminal Investigations, and she was demoted and ultimately terminated for job performance deficiencies and violation of work rules, but she has not identified a comparator who was treated more favorably. Although Defendants argue that her "voluntary demotion" with its accompanying pay cut was more like a resignation than an adverse action, the Court disagrees and rejects the argument summarily because she suffered a pay cut and reduction in rank.[29] However, because she has not identified an adequate comparator outside her protected class who was treated more favorably, Montoya cannot prevail under this framework. *See Rioux*, 520 F.3d

---

[29] Defendants' reliance on Montoya's own email, stating she was voluntarily stepping down to honor her contract, as showing no adverse action is unpersuasive because it presumes, contrary to the evidence, that Montoya was given a meaningful choice and that gender played no role. Viewing the facts in the light most favorable to her, Montoya had no choice but to accept one of two pay cuts. As she stated in her email, "both options given to me are, respectfully involuntary." ECF No. 79-8. Also, although Sheriff Morgan's deficiency letter stated this was not disciplinary in nature, a reasonable juror could find that it represented a type of discipline because, regardless of whether she chose a voluntary or involuntary demotion, she would receive a cut in pay and demotion in rank. Also, despite the Executive Staff Agreement giving the Sheriff discretion and reflecting Montoya's agreement to relinquish rank if she did not fulfill the Sheriff's requirements, the demotion can nevertheless be considered an *illegal* employment practice if the real reason was her gender. It is sufficiently adverse for purposes of the *prima facie* case.

at 1276. To be similarly situated, "the quantity and quality of the comparator's misconduct" must be "'nearly identical' to prevent judges from second-guessing employers' reasonable decisions." *Burke–Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006). Montoya names Lieutenant Joe Webber and Lieutenant Mike Gilmore as comparators but does not explain or point to any evidence showing how they were similarly situated to her. She argues that Webber was not disciplined for the use of profanity, but the record demonstrates otherwise, and in any event, neither Montoya's demotion nor her termination was based on her use of profanity.[30] Gilmore's insubordination for failing to release a suicide note when ordered to do so, for which he was reprimanded, is not comparable to Montoya's conduct of refusing to delete an internal Sheriff's office document as ordered and then disseminating it to a legal adversary of ECSO in litigation, for which she was terminated. As explained by the Disciplinary Review Board, Montoya's conduct was far different in nature and more egregious than basic insubordination. Neither Webber nor Gilmore can be considered similarly situated and "nearly identical" to

---

[30] The record shows that Webber in fact was demoted to Lieutenant in 2010, in part for misconduct including the use of profanity. In 2014, he sustained a minor policy violation for rude verbal conduct and the use of profanity with subordinates. Montoya, by contrast, received only a verbal counseling for the use of profanity, which does not show she was treated more harshly, even if she and Webber could be considered sufficiently similar.

Montoya, and thus, she has failed to make out a *prima facie* case of discriminatory demotion or termination under the *McDonnell Douglas* framework.

Even assuming Montoya could establish a *prima facie* case, the Sheriff has put forward legitimate nondiscriminatory reasons for her demotion, consisting of several job performance deficiencies, and legitimate reasons for her termination. The burden then shifts to Montoya to show that the reasons given were a mere pretext for discrimination, but she offers no evidence or even argument to show that Morgan's demotion or termination decision was a pretext for gender discrimination in her *McDonnell Douglas* discussion. *See* Response, ECF No. 94, at 69-74. When, as here, a proffered reason is one that might have motivated a reasonable employer, the plaintiff cannot merely "quarrel with the wisdom of that reason" but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). At most, it is evident from the record as presented by Montoya and her other arguments that she disagreed with how her job performance was characterized for purposes of the demotion; she maintains that her conduct did not amount to any policy violation; and she disagrees that the position statement she disseminated was confidential, but she does not dispute that the events listed in the demotion letter or stated as the basis for her termination actually occurred. The Eleventh Circuit instructs that an employer acting "under the mistaken but honest

impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). There is no evidence that Morgan did not honestly believe—rightly or wrongly—that the incidents occurred and demonstrated deficiencies in judgment or policy violations, nor is there any evidence or inconsistencies demonstrating that he in fact did not base his demotion and termination decisions on those documented incidents. Thus, there is no question of fact as to pretext for purposes of the *McDonnell Douglas* analysis.

The Court recognizes that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a discrimination claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys*., 408 F.3d 763, 768, n.3 (11th Cir. 2005). A plaintiff can survive summary judgment by showing a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Discrimination can also be shown by direct or circumstantial evidence under a mixed-motive framework, where both legitimate and illegitimate reasons motivated the employer's adverse employment decision. *See Quigg v. Thomas Cty. Sch. Dist.,* 814 F.3d 1227, 1235 (11th Cir. 2016). Under this framework, the question is whether there is evidence that (1) the employer took an adverse

employment action against the plaintiff, and (2) a protected characteristic was "a motivating factor" for that action. *Id.* at 1239. Under the mixed motive theory, the employer still has the opportunity to show that it would have made the same decision in any event, which allows the employer to avoid damages under Title VII and serves as a complete bar to liability in the § 1983 context. *Quigg*, 814 F.3d. at 1239 n.9, 1242; *see also* 42 U.S.C. § 2000e-5(g)(2)(B) (stating that if the employer would have taken the same action even absent the impermissible motivating factor, the court "shall not award damages").

Defendants argue that the record does not establish a "convincing mosaic of circumstantial evidence" of discrimination under *Smith v. Lockheed-Martin Corp.*, or that Sheriff Morgan, the sole decisionmaker for the ECSO, acted on a mixed motive under *Quigg*. Montoya advances no argument directly addressing either theory, and the Court agrees there is no convincing mosaic of circumstantial evidence to show that Morgan acted based on a discriminatory intent. Nonetheless, because the evidence and arguments Montoya did present support a mixed-motive theory, the Court will address it. *See Jefferson v. Sewon Am. , Inc.*, 891 F.3d 911, 922-23 (11th Cir. 2018) ("parties cannot waive the application of the correct law or stipulate to an incorrect legal test"); *Quigg*, 814 F.3d at 1235 (stating it is improper to use the *McDonnell Douglas* framework to evaluate a mixed motive claim). The

record plainly shows that the Sheriff took adverse actions against Montoya by demoting and terminating her, and thus, the only issue under this framework is whether there is a genuine question of fact that Montoya's protected status motivated the adverse decisions. For reasons that follow, Montoya's evidence raises a concern that Haines and Shelby's gender-biased input may have impacted Sheriff Morgan's demotion decision but not the termination decision.

A motivating factor can be shown by the conduct of a biased supervisor even when that person was not the final decisionmaker if the plaintiff shows that the biased supervisor used the final decisionmaker as his "cat's paw"—that is, if the decisionmaker acted based on input from a biased supervisor without independently evaluating or investigating the situation. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."). More recently, the Supreme Court has also explained that where a supervisor's actions are motivated by discriminatory animus and "*intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action," then the employer may be liable because both the biased supervisor and the ultimate decisionmaker *caused*

the adverse action, acting as agents of the employer.  *Staub v. Proctor Hosp.,* 562

U.S. 411, 422 (2011) (discussing the Uniformed Services Employment and

Reemployment Rights Act, "USERRA," and recognizing that it is "very similar to

Title VII").  Even where there is an independent investigation, the Supreme Court

explained, this does not insulate the employer from liability if the facts relied on

were provided to the decisionmaker by a biased supervisor, were intended to result

in the adverse action, and in fact were the proximate cause of that action.  *Id.* at 421-

22 (stating a "supervisors biased report may remain a causal factor if the independent

investigation takes it into account without determining that the adverse action was,

apart from the supervisor's recommendation, entirely justified"). On the other hand,

an employer will not be liable where an independent investigation results in the

adverse action but "for reasons unrelated to the supervisor's original biased action."

*Id.* at 421; *see also King v. Volunteers of Am., N. Alabama, Inc*., 502 F. App'x 823,

828 (11th Cir. 2012) (finding a question of fact based on *Staub* under Title VII and

§ 1981). "[T]he crux of the analysis at the summary judgment stage is whether the

plaintiff has offered sufficient evidence to establish a genuine issue of

discrimination." *Quigg*, 814 F.3d at 1240.

Applying these principles, the Court finds a question of fact based on the

demotion decision.  It is undisputed that Haines and Shelby both provided input to

Sheriff Morgan in which they characterized Montoya's job performance in several incidents as deficient, and both were acting within the scope of their employment as Montoya's supervisors at the time. *See Straub*, 562 U.S. at 422 n. 4 (noting the employer is only liable if the supervisor was acting within the scope of his employment). Sheriff Morgan included Haines and Shelby's reports of Montoya's deficient performance in his deficiencies/demotion letter to Montoya, expressly referencing their input. There are questions of fact from the circumstantial evidence as to whether Haines and Shelby acted with discriminatory intent in how they characterized Montoya's job performance. Both had expressed disapproval over Montoya's promotion to the rank of Captain and made comments that she should still be a Lieutenant. There is also evidence of gender-discriminatory animus by both—i.e., that Shelby did not want a woman running investigations and at times had called her gender-based derogatory names and that Haines harbored a discriminatory view of women in elevated positions in law enforcement, such as that women should be subordinate to men, women should not be in a leadership position, and men should not take direction from women in law enforcement, showing a discriminatory animus. *See Llampallas*, 163 F.3d at 1246 ("the act of sexual harassment itself creates an inference that the harasser harbors a sexually discriminatory animus towards the plaintiff"). Montoya also presented affidavit

evidence that Haines told Nix he was setting Montoya up for failure in the Gilmore incident, and the Gilmore incident factored heavily in Sheriff Morgan's demotion decision, as reflected in his letter. And Montoya stated that Shelby was trying to create pretextual reasons for disciplining her (*i.e.*, giving her advice or instructions and then criticizing her when she followed it, citing her resulting indecisive conduct as a job deficiency). Based several incidents reported by Shelby, Morgan criticized Montoya in the demotion letter for, among other things, failing to communicate with, or seek support and guidance from, her supervisor, Shelby, citing this as a "fundamental and over-arching deficiency," and in part based on information from Haines, Morgan found performance deficiencies in how Montoya handled the Gilmore investigation. Thus, although neither Shelby nor Haines recommended Montoya's demotion and the events were not fabricated, they provided input that may have been motivated by gender bias, and there is evidence that Morgan relied on their input and their characterization of Montoya's competence, judgment, and leadership abilities in deciding to demote her. Viewing the evidence in the light most favorable to Montoya, there is a question of fact as to whether the actions of Shelby and Haines were motivated by gender bias and *intended* to cause the adverse employment action of Montoya's demotion, and whether their input was a proximate cause of her demotion. *See Staub,* 562 U.S. at 422. Although the employer can

avoid damages if it would have taken the same action in the absence of the impermissible motivating factor, 42 U.S.C. § 2000e-5(g)(2)(B), the record contains a question of fact because, despite Sheriff Morgan's statement that he based the decision to voluntarily demote Montoya on his own judgment of her performance deficiencies, not the recommendation of Shelby or Haines, the record shows that he clearly relied on their input and characterization of the deficiencies to a great extent.

No such question of fact exists regarding the termination decision. In that instance, Morgan requested the investigation after ECSO's attorney notified him that Montoya brought documents to the deposition, which might have violated policy. Morgan ultimately made the termination decision six months later based on information developed in an independent investigation and after considering the recommendation of an independent Disciplinary Review Board. Neither Shelby nor Alford was involved. Haines was the complaining officer because he had given the order for Montoya to delete the email in November 2013, so he was interviewed during the investigation, but there is no evidence of an intent to get Montoya fired by directing her to delete the email in November 2013, before she was even subpoenaed to testify. Others were interviewed as well regarding Montoya's conduct at the *Hemphill* deposition, including the ECSO attorneys who had been present at the deposition. Notably, Lieutenant Doyle Gresham, not Haines, was in

charge of the investigation. Doyle created an independent report with findings sustaining the charges, and an independent Disciplinary Review Board provided another layer of review and a recommendation, destroying any possible causal connection between Montoya's termination and a potential discriminatory intent on the part of Haines. Additionally, whether Montoya's conduct actually amounted to insubordination or a policy violation is not for this Court to decide. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("Whether [plaintiff's] conduct was insubordinate is not an issue for this Court to referee."). Thus, the record creates no inference of discrimination regarding the termination decision.

## B.    Hostile Work Environment

Montoya claims she was subjected to a hostile work environment based on gender due to statements made in the workplace by Haines and Shelby, which Morgan allegedly condoned or ratified. Defendants argue that any gender-biased comments by Haines were made in 2008 or 2009, well outside the Title VII and FCRA statutory windows, and thus are barred from consideration.[31]  The Court rejects this argument because Montoya alleges that she encountered harassment in

---

[31]  A claim must be filed within 300 days under Title VII, 42 U.S.C. in § 2000e-5(e) and 365 days under FCRA, Fla. Stat. § 760.11(a). Defendants mistakenly state that Montoya's EEOC Charge of Discrimination was filed on "April 8, 2014," when it was actually filed on April 8, 2015. Using the correct date, the earliest cutoff date for a discriminatory act is April 8, 2014.

the workplace on a daily basis. A claim of hostile work environment based on harassment "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [appropriate] time period." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 (2002); *see also Hipp v. Liberty Nat'l Life Ins. Co*., 252 F.3d 1208, 1221 (11th Cir. 2001) ("continuing violation" doctrine permits a plaintiff to pursue an otherwise time-barred claim where at least one other violation occurred within the statutory period). Haines and Shelby both supervised Montoya and both were members of the Command Staff. Their allegedly hostile actions continued into the statutory period by reason of Shelby's alleged gender-biased insults and at least one alleged gender-biased comment by Haines in April 2014, suggesting that her husband makes plenty of money so she could stay home where she belonged. Thus, all related acts can be considered in determining whether there was ongoing hostility toward women in the workplace.

The conduct alleged, however, fails to rise to the level of severity or pervasiveness that is required to establish a hostile environment. To establish a hostile work environment claim, a plaintiff must (1) belong to a protected class, (2) produce evidence of unwelcome harassment (3) based on the protected characteristic (4) that was severe or pervasive enough to alter the terms and conditions of

employment, and (5) that the employer is responsible for the environment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Viewing the evidence in Montoya's favor, as the Court must at this stage, Montoya could satisfy only the first three elements—there is evidence that she is in a protected class, suffered unwelcome harassment, and at least some of the harassment was based on her gender, i.e., Haines's statements of women being subservient and Shelby's name-calling. *See Reeves v. C.H. Robinson Worldwide, Inc*., 594 F.3d 798, 810-13 (11th Cir. 2010) (*en banc*) ("Calling a female colleague a 'bitch' is firmly rooted in gender. It is humiliating and degrading based on sex.").

The fourth element requires the conduct to be objectively and subjectively hostile or abusive, *see id.* at 809 (citing *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21-22 (1993)), showing a workplace so "permeated with discriminatory intimidation, ridicule, and insult," to the extent that it so severe or pervasive as to "alter the conditions of the victim's employment and create an abusive working environment." *Rojas v. Fla*., 285 F.3d 1339, 1344 (11th Cir. 2002) (quoting *Harris*, 510 U.S. at 21). Objective severity is viewed "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Reeves*, 594 F.3d at 809 (quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998)). Factors include "the frequency and severity of the conduct, whether it is

physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." *Rojas*, 285 F.3d at 1344 (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 647 (11th Cir. 1997)). It is by now axiomatic that Title VII is not a "general civility code," and conduct amounting to "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" are insufficient to constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Montoya has not presented evidence from which a jury could find that the alleged harassment was so severe and pervasive as to alter the terms and conditions of her employment. Subjectively, Montoya viewed her work environment as humiliating and demeaning. She felt physically threatened by Shelby's displays of anger and ultimately felt the need to take medical leave due to resulting stress after her demotion. Objectively, however, the undisputed evidence shows that the workplace was vulgar for everyone because of Shelby's conduct. Male and female employees alike were offended by it because of his profanity-laced yelling and anger. Montoya testified that she was subjected to profanity on a daily basis. She also *argued* that this included belittling gender-based names such as "bitch," but her affidavit statement—which is the only record evidence of Shelby using gender-based name calling—does not say how frequently he used such names. Thus, it does not

support a finding that Shelby called Montoya gender-biased names on a daily basis. The record reflects instead that the majority of the alleged abusive comments involve criticism of specific aspects of her work, criticism of her ability to do the job, and profanity when Shelby was angered over work issues. Montoya's claim that she complained to Sheriff Morgan that Shelby had "created a hostile work environment," ECF No. 95-1, Montoya Aff. ¶89, and had used sexist names does little to establish the necessary severity or pervasiveness of the alleged harassment. Most of the expressly gender-based comments of Haines date back to 2008 or 2009 and were sporadic events, although Haines's views about women were widely known in the workplace. Montoya never complained of them, and the more recent comments alleged also occurred infrequently. For instance, she alleges one statement by Haines in 2011 commenting on a sex act and another in 2014 that Montoya should stay home where she belonged; she also alleges one comment by Shelby in 2013 that women should not be in charge of investigations and name calling of unknown frequency. These inappropriate remarks and Shelby's name calling undoubtedly indicate possible gender-bias on their part, and, as noted above, may be considered when determining whether discriminatory input impacted Sheriff Morgan's ultimate demotion decision. But bias alone does not equate to a hostile work environment where the gender-based harassment consists of sporadic and isolated instances.

Montoya also points to the affidavit of Sherry Nix to show discriminatory treatment and that the incidents were not isolated. Nix felt that "women were more scrutinized" than men when they requested leave for illness or family illness, and she stated that Shelby "yelled loudly, cursed profusely, and spoke very unprofessionally" to her. ECF No. 95-6, Nix Aff. ¶11, 13, 15. Again, the Court cannot find that such remarks show an objectively hostile workplace so "permeated with discriminatory intimidation, ridicule, and insult" based on her sex that it altered Montoya's job performance. *See Rojas*, 285 F.3d at 1344. Defendants are entitled to summary judgment on this claim.

### C.  First Amendment Retaliation—§ 1983

It is well-settled that a public employer may not discharge a public employee in retaliation for speech protected under the First Amendment; it is equally well-settled that a public employee's right to freedom of speech is not absolute. *See Martinez v. City of Opa–Locka,* 971 F.2d 708, 712 (11th Cir. 1992); *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir. 1989) (citations omitted). Four factors are considered: (1) whether the public employee was speaking as a citizen on "a matter of public concern," (2) balancing "whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public

service,"[32] (3) whether the employees speech played a substantial part in the adverse employment action, and (4) "whether the government would have made the same employment decision in the absence of the protected conduct." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1563-64 (11th Cir. 1995) (citing *Bryson,* 888 F.2d at 1565–66).[33]

Two types of speech are discerned from this record—Montoya's deposition testimony under subpoena and her act of disclosing a confidential Sheriff's Office position statement.[34] These are distinct in nature, requiring each to be separately analyzed, but Montoya does not clearly distinguish between them. To show citizen speech on a matter of public concern, Montoya argues only that when a public employee testifies before a government adjudicatory or fact-finding body outside the scope of her official duties, the speech is inherently speech of public concern, but

---

[32] This is the *Pickering* balancing test. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968).

[33] The first and second parts of the *Bryson* test "are questions of law" to be examined by the Court in light of the circumstances presented to determine whether the speech is protected by the First Amendment. *Mitchell v. Hillsborough Cnty.,* 468 F.3d 1276, 1282–83 (11th Cir. 2006) (quoting *Morales v. Stierheim,* 848 F.2d 1145, 1148 (11th Cir. 1988)). The third and fourth parts of the test are "questions of fact designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision." *Beckwith,* 58 F.3d at 1564.

[34] The act of disclosure can be considered speech. *See generally, Ft. Lauderdale Food Not Bombs v. City of Fort Lauderdale*, No. 16-16808 (11th Cir. Aug. 22, 2018) ("Constitutional protection for freedom of speech does not end at the spoken or written word." (internal quotations omitted)).

she makes no argument for why her act of disseminating a document of her employer is protected.

The Supreme Court has acknowledged that citizen speech includes truthful testimony given by a public employee under subpoena and "outside the scope of his ordinary job duties." *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014). This context makes the speech "inherently of public concern," *Johnston v. Harris Cty. Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir. 1989), because "[a]nyone who testifies in court bears an obligation to the court and society at large to tell the truth," *Lane*, 134 S. Ct. at 2379. The Court sees no reason to differentiate this from a sworn deposition, which also is "sworn testimony" taken for use in a judicial proceeding. *See id.* (stating "[s]worn testimony in judicial proceedings is a quintessential example of speech as a citizen"). This obligation to tell the truth persists even if the substance of a public employee's testimony "relates to [her] public employment or concerns information learned during that employment." *Id.* at 2378. Montoya appeared for a deposition in *Anita Hemphill* case, not as part of her job responsibilities, and gave sworn testimony under oath, which was citizen speech on a matter of public concern, regardless of the fact that her statements included personal employment grievances, since she had a duty to testify truthfully. Moreover, because she was testifying in a case regarding gender discrimination in a

public workplace, even the content was a matter of public concern. "[I]t is essential that [public employees] be able to speak out freely on such questions without fear of retaliatory dismissal." 134 S. Ct. at 2379 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568 (1968)); *see, e.g., Flamm v. Am. Ass'n Of Univ. Women,* 201 F.3d 144, 150 (2d Cir. 2000) ("Gender discrimination is a problem of constitutional dimension, and the efforts . . . to combat it clearly relate to a matter of public concern.").

However, Montoya's dissemination of her employer's position statement is another matter. The Supreme Court also noted in *Lane* that public employees may still owe certain obligations to their employer, outside of the sworn testimony: "When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner. But any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth." *Lane*, 134 S. Ct. at 2379. There is no dispute that Montoya was not under a subpoena *duces tecum* to bring documents to the deposition. There is also no dispute that she brought the ECSO's draft position statement about the *Anita Hemphill* case to the deposition without her employer's permission and disseminated it to the party opposing ECSO in the litigation. Despite the fact that the content of the position statement "may

touch up against matters of public concern," *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1167 (11th Cir. 2015), Montoya's conduct of disclosing it was not an act directed to those public concerns.[35]  Montoya's act of disseminating the position statement is therefore not protected speech.  Despite her explanation that she did not believe it was confidential and regardless of whether termination was the correct or fair response to that disclosure as an employment decision, *see Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010) (noting courts "do not sit as super-personnel department[s]"), the disclosure of this paper was not protected speech.

As to Montoya's deposition testimony, the analysis continues to the second step, which requires a balancing of "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" based on the government's interests as an employer.  *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)*; see also Alves*, 804 F.3d at 1159–61.  Defendants offered no justification for why giving truthful testimony at a

---

[35]  Considering the context, Montoya received the document for review in the course of her duties, she was told by a superior that it was confidential and should be deleted after reading, yet she preserved and disseminated it.  Her explanations for bringing it to the deposition do not include an intent or purpose to reveal its contents as a matter of public concern.  Instead, she brought it to refresh her memory and also because Haines had sent it to her and made comments to her that she perceived as an attempt to convince her that he had not previously made discriminatory statements.  Her testimony about this is protected.

deposition would be outweighed by any interest of the Sheriff's office in promoting efficiency in delivering its public services. Courts have consistently found that the balance tips in favor of the expressive interests of the employee in similar situations. *See, e.g., Curtis v. Oklahoma City Public Sch. Bd. of Educ.,* 147 F.3d 1200 (10th Cir. 1998) (the district court held, and the court of appeals did not contest, that testimony offered during hearings and grand jury investigations into racial discrimination and desegregation initiatives is of "public concern"); *Johnston,* 869 F.2d at 1578 (retaliation against those who testify on behalf of others in discrimination hearings "would chill the employees' willingness to testify freely and truthfully and would obstruct the [administrative tribunal's] path to the truth"). Thus, the *Pickering* balance weighs in favor of protecting Montoya while giving sworn testimony over any efficiency interests of ECSO.

The remaining two factors address the causal link between the speech and termination; that is, whether Montoya's deposition testimony was a substantial factor in the termination decision and whether the Sheriff would have made the same employment decision in its absence. *Bryson,* 888 F.2d at 1565–66. These issues are factual and to be resolved by a jury "unless the evidence is undisputed." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). The record here reflects no dispute of fact. The only connection between the termination decision and the

deposition testimony is that Sheriff Morgan received the transcript within two weeks, but the termination decision was made six months later. This is not close enough for temporal proximity alone to raise an inference of retaliation based on the deposition testimony. Sheriff Morgan requested the investigation within a few weeks, but any causal link between this and termination is destroyed by the investigation itself, which was conducted independently by another officer and focused only on Montoya's disclosure of the position statement, not the content of her testimony. Montoya has presented no evidence of pretext in that independent process. The deviation from the discipline matrix (imposing termination instead of a 30-hour suspension) was drastic, but it was recommended and explained by the Disciplinary Review Board, with no input from Morgan or Haines, based on their perception of the evidence and the severity of disseminating Sheriff's office materials without authorization during litigation. The fact that Montoya stated during the deposition that she feared retaliation does not make it so, and her disagreement over whether the position statement was in fact confidential and a policy violation to disseminate does not show that Morgan did not honestly believe the policy was violated by her conduct—Montoya's conduct is undisputed. Although he received the deposition, there is no basis for inferring that Sheriff Morgan considered its substance in the termination decision or that he would have made a

different determination if Montoya had testified differently. Importantly, she was terminated for her separate conduct of insubordination and the dissemination of information at the deposition, not her protected testimony. To find or infer otherwise on this record would be an exercise in pure speculation. Because Morgan was the only decisionmaker, and the claim against him fails as legally insufficient, there is likewise no basis for individual liability against Morgan, Haines, or Alford, as alleged. Defendants are entitled to summary judgment on the claim.

### D.     Retaliation—Title VII, FCRA

Title VII and the FCRA prohibit retaliation against an employee for opposing a practice made unlawful under Title VII (the opposition clause) or for participating in an investigation under Title VII (the participation clause).[36] *See* 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7); *Equal Emp't Opportunity Comm'n v. Total Sys. Servs., Inc*., 221 F.3d 1171, 1174-75 (11th Cir. 2000). In Title VII, Congress chose to protect employees from retaliation "because" of "participat[ion] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). This provision confers on employees "exceptionally broad protection" against

---

[36] Again, "decisions construing Title VII guide the analysis of claims under the Florida Civil Rights Act," *Harper v. Blockbuster Entm't Corp*., 139 F.3d 1385, 1389 (11th Cir. 1998), and therefore, the FCRA claim will not be separately analyzed.

retaliation for conduct within the statute. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected activity; (2) a materially adverse action against the plaintiff; and (3) a causal link between the protected activity and the adverse action. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). The causal link requires "but for" causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 362 (2013). While causation may be inferred from close temporal proximity between the protected activity and the materially adverse action, without more, mere temporal proximity must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Montoya bases her Title VII retaliation claim against Sheriff Morgan on her deposition testimony in February 2015.[37] For the same reasons discussed in the First Amendment context, Montoya cannot establish on this record that her deposition testimony was the "but-for cause" of her termination.

---

[37] Although Count IX of the Second Amended Complaint also references retaliation based on Montoya's charges of discrimination and other complaints, she narrowed the scope of her Title VII retaliation claim by answering in interrogatories that the statutorily protected activity claimed is her "February 13, 2015 sworn, subpoenaed testimony as a witness in the Anita Hemphill case." EC No. 79-22, at 4 (Answer #8).

**E.      Conspiracy to Interfere with Civil Rights—§ 1985(3) and Negligent Failure to Prevent a Civil Rights Violation--§1986**

To establish a conspiracy under § 1985, a plaintiff "must show that the parties reached an understanding to deny plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir. 1990); *see also Bailey v. Board of County Comm'rs,* 956 F.2d 1112, 1122 (11th Cir.1992); *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir. 1988).  A *prima facie* case of conspiracy can be based on circumstantial evidence. *Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 788 (11th Cir. 1992).  To state a claim under 42 U.S.C. § 1985(3), "a plaintiff must prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons from the equal protection of laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Park v. City of Atlanta*, 120 F.3d 1157, 1162 (11th Cir.1997).  Also, under 42 U.S.C. § 1986, a defendant may be liable for the negligent failure to prevent a civil rights conspiracy if he knew of a § 1985 conspiracy and failed to prevent it, despite having the power to do so. *See Park,* 120 F.3d at 1160. "Section

1986 claims are therefore derivative of § 1985 violations" and cannot be established without first establishing a conspiracy under § 1985. *Id*. at 1159–60.

Montoya has presented only speculation in support of her civil rights conspiracy claim. To the extent Shelby and Haines may have influenced the demotion decision, the record indicates that they did so independently and based on separate reasons. Montoya relies on the testimony of Philip Nix that Haines was trying to set her up for failure and Morgan did nothing after being informed. Nix also stated that he learned Shelby had given a contradictory order to Gilmore during that incident, but even assuming these allegations are true, they do not raise an inference that Morgan, Shelby and Haines acted in concert or at any time met or agreed to violate Montoya's civil rights or to deprive her of equal protection under the law by setting her up for failure and a subsequent demotion. Morgan promoted her and the record reflects no discriminatory motive on his part, aside from his consideration of the performance deficiencies noted by Haines and Shelby. Because there is no evidence of a conspiracy, the § 1986 claim fails as well.

### F.    Qualified Immunity

The only constitutional claim going forward is Montoya's Equal Protection claim that her demotion was motivated in part by discrimination. The individual Defendants, Morgan, Haines, and Shelby, argue they are entitled to qualified

immunity. Qualified immunity shields government officials from liability in their performance of discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). To establish the defense, a defendant must show that he acted within the scope of his discretionary authority in performing the challenged conduct, and if so, the plaintiff has the burden to demonstrate that: (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation. *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014). "The contour of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This "clearly established" prong demands consideration of the law "in light of the specific context of the case, not as a broad general proposition." *Rioux,* 520 F.3d at 1282 (quoting *Williams*, 341 F.3d at 1269). Generally, a supervisor sued in his or her individual capacity is entitled to qualified immunity unless he personally engaged in conduct constituting a constitutional violation or, based on information known to him, a reasonable supervisor would have known that his actions were unlawful in light of clearly-established law; in other words, supervisor liability must be based on something

more than the theory of *respondeat superior*. *See Crawford v. Carroll,* 529 F.3d 961, 978-79 (11th Cir. 2008); *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir. 1990).

It is clearly established that the Equal Protection Clause protects against intentional discrimination in employment based on sex. *See Williams*, 341 F.3d at 1268; *Cross v. State of Ala. Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (stating equal protection prohibits sex discrimination and sexual harassment in public employment). When a mixed motive theory of discrimination is advanced, qualified immunity may still apply because it is clearly established that "state officials 'can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully.'" *Rioux,* 520 F.3d at 1283 (discussing qualified immunity in the mixed motive context); *see also Foy*, 94 F.3d at 1534-35. This applies where the record shows state officials would have acted the same, "even if they had lacked discriminatory intent." *Id.*

In this case, there is no dispute that the individual defendants were acting within their discretionary authority. Moreover, the record shows that Morgan's demotion decision was not motivated by personal bias and, at most, it was motivated in part by the biased motive of Haines and Shelby, but also at least in part by

Morgan's evaluation of Montoya's job performance. The indisputable evidence in this case shows that the incidents reported and discussed in the deficiency letters actually occurred, regardless of whether Haines or Shelby acted with a discriminatory animus in how they reported or characterized Montoya's conduct. *See Rioux*, 520 F.3d at 1284-85 (stating a defendant is entitled to qualified immunity if the undisputed record shows "that the defendant in fact was motivated, *at least in part*, by lawful considerations" (internal marks omitted)). Morgan is thus entitled to qualified immunity. As to Haines and Shelby, Montoya seeks to impose personal liability on them for their allegedly discriminatory reports of how she performed her job or acts that "sabotaged" her performance, but Montoya makes no argument as to whether individual liability can be imposed on this theory under § 1983. It is not clearly established in this Circuit that a "recommender" under the cat's paw theory can be individually liable under § 1983 for reporting performance deficiencies in a manner intended to result in a subordinate's termination. *See, e.g., Kamensky v. Dean,* 148 F. App'x 878, 880 (11th Cir. 2005) (discussing extending individual liability under § 1983 based on a "rubber stamping" theory, the court stated: "We have not extended this line of cases to individual liability, and refrain from doing so here."); *see also Kopp v. City of Greensboro*, No. 3:15-CV-17 (CAR), 2016 WL 4435085, at *7 nn. 81, 82 (M.D. Ga. Aug. 18, 2016) (collecting cases from other

circuits that have held individual liability can attach to an individual who acts with discriminatory animus under a cat's paw theory in the § 1983 context, but stating, "neither this Circuit nor the Supreme Court has recognized such liability can attach").[38]  Because neither the Eleventh Circuit nor the Supreme Court has recognized individual liability for a cat's paw "recommender" under § 1983, the Court cannot find that the actions of Haines and Shelby, who made reports but were not final decisionmakers, acted in violation of clearly established law.  Thus, Haines, Shelby, and Morgan are entitled to qualified immunity in their individual capacities, and the demotion claim will proceed only against the Sheriff in his official capacity.

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 78, is **GRANTED** in part and **DENIED** in part, as follows:

1.  Summary Judgment is **GRANTED** on all claims of race discrimination and **GRANTED** for Defendant Alford on all claims;

2.  Summary Judgment on Count I and Count II (First Amendment Retaliation) is **GRANTED**;

---

[38]  *See also Crews v. Paine*, 686 F. App'x 540, 546 (10th Cir. 2017) (noting that qualified immunity applied in "the absence of precedent clearly establishing personal liability under § 1983 based on a cat's paw theory"); *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1104 (10th Cir. 2014) (summary judgment on basis of qualified immunity required when theory of liability relied on by plaintiff was not clearly established).  *But See Harris v. Pierce Cty., Ga.*, No. CV 513-82, 2014 WL 3974688, at *8 (S.D. Ga. Aug. 14, 2014) (criticizing *Kamensky's* "rubber stamp" holding in light of the more decision of the Supreme Court in *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).  This Court notes that *Staub* was not a § 1983 municipal liability case.

3.      Summary Judgment on Count III (Equal Protection/gender) (Defendant Sheriff, official capacity) is **DENIED** as to the demotion, **GRANTED** as to the termination;

4.      Summary Judgment on Count IV (Equal Protection/gender) (Individual Capacities) is **GRANTED** for Alford on all claims, **GRANTED** for Shelby, Haines, and Morgan on claims respecting the termination decision, **GRANTED on grounds of qualified immunity** for Shelby, Haines, and Morgan on the demotion decision, and **GRANTED** as to Shelby, Haines, and Morgan on the hostile work environment claim;

5.      Summary Judgment on Count V (Gender Discrimination/Title VII and FCRA) (Defendant Sheriff, official capacity) is **DENIED**;

6.      Summary Judgment on Count VI (Gender-Based Hostile Work Environment/Title VII and FCRA) (Defendant Sheriff, official capacity) is **GRANTED**;

7.      Summary Judgment on Count VII (Race Discrimination) is **GRANTED**;

8.      Summary Judgment on Count VIII (Race-Based Hostile Work Environment) is **GRANTED**;

9.      Summary Judgment on Count IX (Retaliation/Title VII and FCHR) (Defendant Sheriff, official capacity) is **GRANTED**;

10.     Summary Judgment on Count X (Conspiracy, Section 1985) and Counts XI and XII (Section 1986) is **GRANTED**.

In order to assist the Court in effectively managing its calendar, counsel are directed to confer personally and notify the court in writing, within seven days, of the expected length of the trial and to confirm whether this case is to be tried by judge or jury.  Trial will be scheduled by separate order.  This case is referred to

Magistrate Judge Miles Davis for a pretrial settlement conference, to be scheduled

by the Magistrate Judge and completed within 45 days.

**DONE AND ORDERED** this 30th day of September 2018.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**